Mary Agnes **TRUSTY**, Harry P. Trusty and Trusty Air-Cargo Conveyor Company, a Corporation,

v.

The **UNITED STATES**.

No. 50286.

United States Court of Claims.

June 7, 1955.

As Amended June 15, 1955.

Alan Franklin, Los Angeles, Cal., for plaintiffs.

G. M. Paddack, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is a suit for patent infringement. Plaintiffs contend that claim 1 of patent 1,859,542, and claims 1 and 2 of patent

2,390,230 are infringed by the United States paratrooper's equipment comprising a back-attached parachute, a static line, and an overhead anchor line in the plane, which lines co-act to pull off the parachute cover when the paratrooper jumps from the plane.

Patent 1,859,542 was issued to plaintiff, Harry P. Trusty, on May 24, 1932, on an application filed on October 8, 1929, and is entitled "Life Preserving Mechanism for Airships." In general, this patent discloses a combination of seats, each pivotally and removably mounted in a plane next to one of a series of doors through which, upon actuation by the pilot, the seats and their occupants are swung, on a davit arrangement, to a position outside the plane and then dropped. Thereupon, a parachute, located exteriorly near each door and connected with the adjacent seat, is drawn forth for lowering the seated passengers to earth.[1]

Patent 2,390,230 was issued to plaintiff on December 4, 1945, on an application filed June 19, 1942, and is entitled "Automatic Parachute Delivery Mechanism for Aircraft." In general, this patent discloses mechanisms for the same purpose as those shown in the first patent. The second patent shows a single line of seats mounted on a track system of rails and rollers. An endless chain mechanism engaging the rollers is provided to push the seats along the track. A motor actuated and controlled by the pilot causes the chain and rollers to move the seats successively rearwardly and then laterally to a side door. Each seat has a parachute pack attached to the rear of the seat back, the parachute being provided with a static line or cord secured at one end to the cover of the parachute, and at the other end to a snap hook. The snap hook is attached to a ring which slidably engages a guide rod located near the floor and extending alongside the track system. When the seat is moved to the door and dropped from the airplane, the static cord, having pulled its ring along the guide rod to a stop at the doorway, becomes extended by the fall of the seat and the parachute cover is jerked off. When the assembly between the parachute cover and the seat becomes fully extended, a break cord connecting the cover to the apex of the parachute canopy is ruptured and the parachute opens lowering the seat to the ground. Both the parachute cover and the static cord are left attached to the guide rod of the airplane.

The three claims in suit are as follows:

"*Claim 1 of Patent 1,859,542*

"In a life preserving mechanism for airships, seats for passengers, parachutes connected to said seats, and means, operated by the pilot of the airship, for swinging said seats, with the passengers therein, out of the airship, and dropping the seats and passengers in said parachutes.

"*Claim 1 of Patent 2,390,230*

"In combination with an airplane and its cabin with a door in a side wall of said cabin at the rear of the wings of the plane, a plurality of parachute carriers movably mounted in said cabin one behind the other longitudinally of said cabin, parachutes connected to said carriers, respectively, means whereby said carriers may be conveyed longitudinally rearwardly and then laterally in the cabin out through said cabin door and dropped from the plane, and means whereby said parachutes are automatically opened when said carriers are dropped from the plane.

"*Claim 2 of Patent 2,390,230*

"In combination with an airplane, a parachute carrier, a parachute container comprising a container member secured on said carrier and a container cover detachably mounted on said container member, a parachute enclosed in said container, a cord connecting the top of said parachute to the inside of said container cover, risers connected at one end to

---

1. Finding 4 contains a more detailed description of the mechanism.

the shroud lines of said parachute with their other ends projecting out of said container, a harness in which said carrier is mounted with the upper ends of said harness connected to said other projecting ends of said risers, a static cord connected at one end to said container cover, a guide rod mounted in said plane and extending to a door in one side of the plane at the rear of the plane wings, and the rear end of said guide rod being secured to a fixed part in said plane, a ring connected to the other end of said static cord and slidable on said guide rod, and means whereby said carrier may be conveyed from said plane out through said door and dropped into space, while said static cord ring is drawn by the carrier and static cord to the rear secured end of said guide rod and said ring retained on said rear end of said guide rod."

The parties have agreed that prior to the filing of this suit defendant was using parachute delivery mechanisms for aircraft, including static cords. It is plaintiffs' position that five structures employed by defendant infringed selected claims of plaintiffs' patents.

The first accused structure is entitled "Trolley, AC–1 Bailout and Escape Parachute Trainer, Type A–1." The military specifications placed in evidence by plaintiffs disclose a trolley assembly consisting of pulley wheels, plates, braces, and a harness support bar, and state that the trolley was intended for use with the type AC–1 bailout and escape trainer to train aircrew members in the proper technique of bailing out of aircraft. There was no evidence offered of the actual use of this particular mechanism in aircraft. One witness called by plaintiffs testified that the trolley assembly disclosed in the specifications was similar to a trolley assembly employed in connection with a mock-up tower used in his preliminary training as a paratrooper at Fort Benning, Georgia, in 1946. (Finding 9)

The second accused structure was disclosed by two photographs of the cabin interior of an airplane. One picture showed bench-like seats extending along either side of an airplane cabin, and the other picture showed the same seats stowed or folded down against the cabin walls. The seats were in no way related to any parachute or life preserving system or mechanism. An anchor cable was shown extending longitudinally in the plane cabin near the ceiling. The printed material in connection with the photographs stated that when the seats were not being used for passengers, they might be folded against the sides of the cargo compartment; that safety belts were installed in the fittings on the bench support beams; that the cabin was equipped with a flexible steel anchor cable and attaching fittings, which could be removed and stowed out of the way when not in use; that the floor was equipped with skidproof panels to assure safe footing for the paratroops; that the flooring should be removed before loading cargo since it was not designed to handle any loads greater than would be applied by paratroops.

The third alleged infringing structure consisted of a steel anchor cable installed in various types of Government airplanes. The structure was evidenced by a blueprint of a U. S. Army Air Corps' drawing showing the cable extending longitudinally near the ceiling of a plane cabin from a point near the front bulkhead, past the side door, to a point near the rear bulkhead. The specifications noted that the one-quarter inch cable should be of sufficient length to permit a six-inch sag to be adjusted to suit each airplane.

The fourth structure was evidenced by a blueprint of a Fairchild Aircraft drawing of a swage-type cable assembly design for securing the ends of an anchor cable in an airplane.

The fifth structure consisted of certain paratrooper's equipment of the Army, consisting primarily of a main parachute pack with a static line or cord, the outer end of which had a snap hook adapted to engage and slide along an anchor cable of the type described as the third infring-

ing structure above. A reserve parachute pack of the chest type was part of this equipment. A harness is provided to fit about the body of the paratrooper, and the tray of the main parachute pack is secured on the harness against the back of the wearer. The parachute proper is assembled on the tray, and a cover over the parachute is laced to the edge of the tray. The static line is secured at one end to the outer side of the cover. By means of the snap hook at the other end, the individual paratroopers attach their static cords to the overhead anchor cable in preparation for the jump. The paratroopers form a line and walk in succession to the side door and manually move their snap hooks along the cable. As each man jumps through the doorway, the static line is extended, and the cover is jerked off the parachute tray. The cover is attached to the apex of the parachute canopy by means of a break cord. The canopy, and in succession, its attached shroud lines and suspension ropes secured to the harness are drawn from the tray, and when fully extended, the break cord is ruptured and the paratrooper is lowered to the ground. The cover and static line are left attached to the anchor cable of the plane. A reserve pack is used only in the event of failure of the main pack to function. It is secured to the harness in front of the paratrooper's chest and is manually operated by the pulling of a rip cord as distinguished from the automatic operation of the main pack. Plaintiffs do not allege that the reserve pack is an infringing structure.

The commissioner found (finding 14) that none of the alleged infringing structures had "seats for passengers" or "parachutes connected to said seats" in a life-preserving mechanism for airships, and that none of them had "means, operated by the pilot of the airship, for swinging said seats, with the passengers therein, out of the airship, and dropping the seats and passengers in said parachutes." He found, accordingly, that none of the structures infringed claim 1 of patent 1,859,542.

In connection with claim 1 of patent 2,390,230 the commissioner found (finding 15) that none of the accused structures had parachute carriers movably mounted in the cabin or means whereby the carriers could be conveyed longitudinally rearwardly and laterally out through the cabin door. The commissioner rejected the plaintiffs' contention (1) that the men could be considered as the "carriers" instead of the seats in plaintiffs' patent; (2) that the harness of defendant's parachute equipment was the same as the seat or carrier in plaintiffs' patent; and (3) that the floor of the airplane in the defendant's equipment was the same as the conveying means in plaintiffs' patent. He noted that the patent specifications and claims indicated the separate entities and functions of plaintiffs' carriers, mounting, and harnesses, and found that nothing in the accused equipment amounted to such carriers or conveying means. The commissioner found that claim 1 of this patent was not infringed by the accused structures.

As to claim 2 of patent 2,390,230 the commissioner found (finding 16) that certain elements thereof had no counterparts or equivalents in the defendant's accused equipment. The defendant's equipment had no carrier; there was no parachute container member secured on the carrier nor the associated parachute parts and accessories mounted on the carrier; there was no harness in which a carrier was mounted; and there was no carrier-conveying means. The commissioner did find that the static line, snap hook, anchor cable and parachute assembly of the defendant's equipment were the mechanical equivalents of and performed the same functions as the static line, slidable ring, guide rod and parachute assembly of claim 2 of patent 2,390,230, but he noted that *all* elements of claim 2 were not met and that the *combination of the claim* was not found in the defendant's equipment. The commissioner found that the accused structures did not infringe claim 2 of patent 2,390,230.

■ We agree with the commissioner's findings 14, 15, and 16 that the patent claims in suit are not infringed by the accused structures. The patents in suit are in a crowded field and must be narrowly construed, and so read, the alleged infringing structures do not respond to the specific terms of the three claims. Furthermore, the accused structures do not include structural elements equivalent to those specifically set forth in the three claims. The importance of the terminology employed in a patent claim was emphasized by the Supreme Court in White v. Dunbar, 119 U.S. 47, 51–52, 7 S.Ct. 72, 74, 30 L.Ed. 303, as follows:

"Some persons seem to suppose that a claim in a patent is like a nose of wax, which may be turned and twisted in any direction, * * * so as to make it include something more than, or something different from, what its words express. * * The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the *plain import of its terms*. [Italics supplied.]"

As this court stated in Kuhne Identification Systems, Inc. v. United States, 82 Ct.Cl. 237, 258, "The claims alone express the monopoly."

■ Plaintiff contends that patent 1,-859,542, filed in 1929, was a pioneer and primary patent and should not be limited to the specific structural means described in the patent specifications. We cannot agree with that contention. An article on parachutes in a magazine, published in 1926, and introduced in evidence by defendant, mentioned schemes controlled by the pilot for dropping seated passengers with a parachute. In view of such a published statement, the specific terminology of claim 1 of patent 1,-859,542, reciting seats for passengers, parachutes connected to the seats, means for swinging said seats out of the plane,

etc., must be considered as constituting material limitations in the claim. Inventors are chargeable with a knowledge of all preexisting devices, as stated by the Supreme Court in Mast, Foos & Co. v. Stover Manufacturing Co., 177 U.S. 485, 493, 20 S.Ct. 708, 44 L.Ed. 856, and hence their patent claim terminology must be strictly construed, if possible, to avoid all prior disclosures.

With respect to the claims in patent 2,390,230, reciting means whereby the parachutes are opened automatically, or reciting a static cord connected to the parachute container and to a guide rod, defendant introduced in evidence a parachute manual published in 1920 which mentions that knapsack parachutes developed in 1913 had a rip cord attached to the plane to pull the pack open as the jumper dropped away, and the manual also referred to a "Robert's airplane type parachute" of the "rip cord attached to the airplane type." The 1926 publication referred to above also described the use of an automatic or static lanyard attached to the fuselage of an airplane and to the parachute.

■ Under the circumstances of this case, both patents must be narrowly construed, and so construed, the specific terminology of the three claims cannot be stretched or twisted into the pioneer invention category. Accordingly, we conclude that the claims in suit are not infringed by the accused structures.

■ In view of the fact that we have found the patent claims in suit not infringed, we need not determine whether the Trusty patents are valid or invalid. Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450.

The petition is dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner Roald A. Hogenson, and the briefs and argu-

ment of counsel, makes findings of fact as follows:

1. This is a patent suit alleging infringement of United States Letters Patent Nos. 1,859,542 and 2,390,230 issued to the plaintiff, Harry P. Trusty, respectively on May 24, 1932, and December 4, 1945, on applications filed in the Patent Office on October 8, 1929, and June 19, 1942.

The first patent is entitled "Life Preserving Mechanism for Airships." Expressly asserted to be an improvement on the former, the second patent is named "Automatic Parachute Delivery Mechanism for Aircraft." Copies of the patents are in evidence as plaintiffs' exhibits 1 and 2, and copies of the Patent Office file wrappers and references are in evidence as defendant's exhibits 1, 1–A, 2, and 2–A.

The plaintiffs, Harry P. Trusty and Mary Agnes Trusty, at all times pertinent in this case, were and now are husband and wife, citizens of the United States, and residents of the State of California; and the plaintiff, Trusty Air-Cargo Conveyor Company, was and is a California corporation with its place of business at Los Angeles, California.

By the original petition filed August 23, 1951, Mary Agnes Trusty was the sole party plaintiff. By First Amended Petition filed January 7, 1952, Harry P. Trusty and Trusty Air-Cargo Conveyor Company were added as parties plaintiff.

Title—Trusty Patent 1,859,542

2. By written instrument dated August 24, 1932, recorded in the Patent Office August 27, 1932, Harry P. Trusty assigned his entire right, title and interest in and to the invention and patent (1,859,542) to Mary Agnes Trusty.

Mary Agnes Trusty assigned the entire right, title and interest in and to the invention and patent to The Trusty Aircraft Corporation, Ltd., by written instrument dated August 24, 1936, duly recorded August 31, 1936.

The latter assignee, not a party to this suit, assigned back to Mary Agnes Trusty the whole right, title and interest in and to the invention and patent, by written instrument dated March 2, 1939, duly recorded March 6, 1939.

By written instrument dated November 25, 1946, recorded November 17, 1947, Mary Agnes Trusty granted to Harry P. Trusty an exclusive license to make, use and sell the invention covered by the letters patent, and stipulated that the license could be assigned in whole or in part by the licensee without the approval of the licensor.

By written instrument dated November 25, 1946, recorded November 17, 1947, Harry P. Trusty assigned to Trusty Air-Cargo Conveyor Company all benefits flowing to him out of the exclusive license from Mary Agnes Trusty, and provided:

"* * * that in the event the said assignee, Trusty Air-Cargo Conveyor Company, be adjudged bankrupt, whether voluntarily or involuntarily, that no rights under this assignment or said license shall pass to the trustee in bankruptcy, or be an asset of said bankrupt, nor shall the said bankrupt nor the creditors thereof have any rights in or to this assignment whatsoever, but this assignment shall become null and void upon an adjudication of bankruptcy of the said assignee; and provided further, that this assignment is personal and it is made to the assignee for personal reasons and that the assignee shall not have the right to assign the annexed license or any rights thereunder, nor grant any sublicense under said license without my written consent first had and obtained."

By written instrument dated March 20, 1953, recorded March 23, 1953, Trusty Air-Cargo Conveyor Company assigned to Harry P. Trusty all of its right, title and interest in and to the invention and patent.

By written instrument dated March 20, 1953, Harry P. Trusty granted to Trusty Air-Cargo Conveyor Company the exclusive license to manufacture and

sell, and a non-exclusive license to use the invention, and stated conditions in substance like the terms quoted in block form above.

### Title—Trusty Patent 2,390,230

3. By written instrument dated July 24, 1946, recorded in the Patent Office July 29, 1946, Harry P. Trusty assigned the whole right, title and interest in and to the patent (2,390,230) to Mary Agnes Trusty.

By written instrument dated November 25, 1946, recorded November 17, 1947, Mary Agnes Trusty granted to Harry P. Trusty an exclusive license to make, use and sell the invention covered by the letters patent, and provided that the license could be assigned in whole or in part by the licensee without the approval of the licensor.

By written instrument dated November 25, 1946, recorded November 17, 1947, Harry P. Trusty assigned to Trusty Air-Cargo Conveyor Company all benefits flowing to him out of the exclusive license from Mary Agnes Trusty. The same conditions were stated as are set forth in the quotation in block form in the preceding finding.

By written instrument dated March 20, 1953, recorded March 23, 1953, Trusty Air-Cargo Conveyor Company assigned to Harry P. Trusty all of its right, title and interest in and to the invention and patent.

By written instrument dated March 20, 1953, Harry P. Trusty granted to Trusty Air-Cargo Conveyor Company the exclusive license to manufacture and to sell, and a nonexclusive license to use the invention, and stated conditions in substance like the terms quoted in block form in the preceding finding.

### The Patents in Suit

4. Trusty Patent 1,859,542 relates to a mechanism, controlled by the pilot of an airship, whereby passengers may be safely discharged in parachutes from the airship in case of an emergency. A single row of seats is provided along each side of the interior of the cabin of an airplane. Each seat is adjacent to a side-wall doorway equipped with a door designed to fold together in vertical half-sections and to swing into the cabin, leaving an opening through which the seat is to be moved outside the cabin. Each seat is detachably mounted on a crank assembly.

The pilot grasps a handle, and rotates a shaft, sprocket and ratchet, and by a mechanical system consisting of an endless chain, sprockets, levers, links, shafts, cables, drums, davits, and related parts, the rear door on each side of the cabin is first caused to open, and then each of the adjacent seats to move through its doorway and become suspended on a davit outside of the cabin. The rear seats drop from the airplane, the rear doors close, and the next forward door on either side of the cabin opens, and the adjacent seats are discharged. By continuous operation of the system by the pilot, all seats leave the airplane in successive pairs from the rear of the cabin to the front.

As each seat moves through its adjacent doorway, it is raised off its crank assembly by a davit, and is suspended outside the cabin by means of ropes. The ropes are permanently attached to the seat and also to a link at their upper ends. The link engages a trip hook on the davit. By automatic operation of the trip hook assembly, the link is disengaged, and the seat falls by force of gravity.

A parachute is detachably mounted outside the cabin below each door. The suspension rope of the parachute is extended upwardly, detachably mounted along the davit, and is permanently attached to the link holding the suspension ropes of the seat. Upon the disengagement of the seat link by operation of the trip hook assembly, the seat falls with its suspension ropes and link, the suspension rope of the parachute is disengaged from the davit and becomes fully extended, whereupon the shroud lines and the canopy are pulled from the parachute cover, and the parachute opens. The seat and its passenger, who at the re-

quest of the pilot had previously strapped himself in the seat by means of emergency straps provided, are lowered slowly to the ground.

5. Trusty Patent 2,390,230 relates to a parachute delivery mechanism for aircraft, controlled by the pilot, whereby passengers, mail or freight, may be automatically, quickly and safely delivered from the aircraft with parachutes, at any suitable altitude, and particularly low altitudes, and it is asserted in the specification that it is an improvement on the first Trusty patent.

█ This patent specifies a single line of seats extending longitudinally within the cabin of an airplane. The seats are mounted on a track system of rails and rollers. An endless chain mechanism engages the rollers provided to push the seats along the track mounting. A motor actuated and controlled by the pilot causes the chain and rollers to move the seats successively rearwardly and then laterally to a side door. The lateral movement is caused by means of a curve provided in the track system.

Each seat, generally described as a parachute carrier, has a parachute pack attached to the rear of its back. Each parachute is provided with a static line or cord which is secured at one end to the cover of the parachute, and at its other end to a snap hook. The snap hook is attached to a ring which slidably engages a guide rod. This rod is located near the floor and extends alongside the track system.

The seat, with a passenger strapped in it by a safety belt, after movement to the door, drops from the airplane. The static cord, having pulled its ring along the guide rod to a stop at the doorway, becomes extended by the fall of the seat. The parachute cover is jerked off. Inside the pack, a break cord connects the cover to the apex of the parachute canopy. The canopy, its shroud lines and suspension straps are successively drawn out of the pack, with the suspension straps being secured to the seat harness. When the assembly between the para-

chute cover and the seat becomes fully extended, the break cord is ruptured. The parachute opens, and the seat is slowly lowered to the ground. The parachute cover and the static cord are left attached to the guide rod of the airplane.

The patent further specifies that the seats or carriers might be delivered from the airplane without use of the motor provided to operate the system, by inclining the forward end of the airplane upwardly and properly controlling the operating lever, whereupon the carriers would run rearwardly over the carrier mounting and through the doorway of the airplane.

6. In the specification of each patent, the patentee stated in part as follows:

"In this specification and the annexed drawings, I disclose my invention in what I consider a desirable and practical form, but I do not limit my invention to such form because it may be embodied in other forms and I desire it to be understood that in and by the claims of this specification I intend to cover my invention in whatever form it may be embodied."

### Claims in Issue

7. The claims in issue are claim 1 of Patent 1,859,542 and claims 1 and 2 of Patent 2,390,230, which are as follows:

### Patent 1,859,542

"1. In a life preserving mechanism for airships, seats for passengers, parachutes connected to said seats, and means, operated by the pilot of the airship, for swinging said seats, with the passengers therein, out of the airship, and dropping the seats and passengers in said parachutes."

### Patent 2,390,230

"1. In combination with an airplane and its cabin with a door in a side wall of said cabin at the rear of the wings of the plane, a plurality of parachute carriers movably mounted in said cabin one behind the other longitudinally of said cabin, para-

chutes connected to said carriers, respectively, means whereby said carriers may be conveyed longitudinally rearwardly and then laterally in the cabin out through said cabin door and dropped from the plane, and means whereby said parachutes are automatically opened when said carriers are dropped from the plane.

"2. In combination with an airplane, a parachute carrier, a parachute container comprising a container member secured on said carrier and a container cover detachably mounted on said container member, a parachute enclosed in said container, a cord connecting the top of said parachute to the inside of said container cover, risers connected at one end to the shroud lines of said parachute with their other ends projecting out of said container, a harness, in which said carrier is mounted with the upper ends of said harness connected to said other projecting ends of said risers, a static cord connected at one end to said container cover, a guide rod mounted in said plane and extending to a door in one side of the plane at the rear of the plane wings, and the rear end of said guide rod being secured to a fixed part in said plane, a ring connected to the other end of said static cord and slidable on said guide rod, and means whereby said carrier may be conveyed from said plane out through said door and dropped into space, while said static cord ring is drawn by the carrier and static cord to the rear secured end of said guide rod and said ring retained on said rear end of said guide rod."

By formal stipulation filed May 26, 1953, the parties agreed that the questions of validity and infringement of the patents be first determined, and that the issues of extent of liability, if any, and amount of compensation, if any, be deferred until the entry of the order of the Court sustaining or dismissing the petition.

## Alleged Infringing Structures

8. By formal stipulation filed May 26, 1953, the parties agreed that parachute delivery mechanisms for aircraft, including static cords, were used by the defendant within six years prior to the filing of this action, as represented in four documents, received in evidence as plaintiffs' exhibits 16, 17, 18 and 19.

At the trial, defendant's exhibit 24 was agreed upon and received in evidence as certain parachute equipment used by the defendant prior to the filing of this suit.

The plaintiffs rely upon these five exhibits as showing infringement of the alleged inventions.

9. Plaintiffs' exhibit 16 is a copy of a military specification (Mil–T–5362A, April 15, 1952) approved by the Departments of the Army, the Navy, and the Air Force for use of the procurement services of the respective Departments. It is entitled "Trolley, AC–1 Bailout and Escape Parachute Trainer, Type A–1." It simply discloses a trolley assembly consisting of pulley wheels, plates, braces, and a harness support bar.

The specification states that the trolley is intended "for use with the type AC–1 bailout and escape trainer to train aircrew members in the proper technique of bailing out of fighter, bomber, and cargo-type aircraft."

There is no evidence of the manner of its actual or intended use, except a brief reference in the testimony of a former United States Army paratrooper called by the plaintiff. He stated that the trolley assembly disclosed in plaintiffs' exhibit 16 was similar (as one trolley assembly can be to another) to the one employed in connection with a mock-up tower used in his preliminary training at Fort Benning, Georgia, in the fall of 1946. The tower was about thirty feet tall, and was equipped with a platform from which the trainee jumped. He had a harness strapped to his body, and the harness was attached by means of suspension straps to a trolley assembly,

which in turn was mounted on a cable extending from the top of the tower on a gradual descent to the ground. The trainee jumped from the platform, received a shock simulating the opening of a parachute, and by means of the trolley assembly slid down the cable to the ground, no parachute being involved in the operation.

10. Plaintiffs' exhibit 17 discloses two photographs of the cabin interior of an airplane, the one depicting bench-like seats extending along either side of the cabin, and the other showing the same seats stowed or folded down against the cabin walls. The seats are obviously no part of nor otherwise related to any parachute or life preserving system or mechanism. The photographs show a "static line" or anchor cable extending longitudinally in the cabin near the ceiling. The document otherwise contains the following descriptions and statements:

"1. Transport and Cargo Provisions.

"a. Transport Provisions.

"(1) *Troop Accommodation.*— Folding benches are installed along each side of the cargo compartment, providing accommodations for 28 troops or other personnel. (See figure 589.) The benches may be folded down against the sides of the cargo compartment when not in use and serve to protect the fuselage structure against damage when in this position. (See figure 590.) There are 28 safety belts installed in the fittings on the bench support beams. In some airplanes, a single seat has been removed from the aft seat section just forward of the main cargo door to allow more room for the jumpmaster at the parapack release control box.

"(a) *Static Line.*—The static line consists of a 7 x 19 extra flexible steel cable, a turnbuckle assembly, and two attaching fittings. The fittings are located in the top of the cargo compartment. The forward fitting is attached to an intercostal at the top of the cargo compartment near the forward bulkhead. The aft fitting is attached to the top of the first frame forward of the lavatory door. The static line is further supported by a fair-lead in a web attached to the third frame forward of the lavatory door. Four spring clips are located directly above the line. When not in use, the line may be snapped into these clips and stowed out of the way. The turnbuckle assembly enables the tension of the line to be adjusted. A sag of 7 inches should be maintained.

"1. *AAF Type Static Line.*— The AAF type static line, with which the ship is equipped, is located at the top of the cargo compartment to the left of the center line of the airplane.

"2. *British-Type Static Line.*— Fittings are also provided for installation of the British-type static line. The same cable is utilized, but it is removed from the overhead attaching fittings and connected to the fittings on the right-hand side of the cargo compartment. The forward fitting for attaching the British-type static line is located on the first frame forward of the first window on the right-hand side of the fuselage and is even with the top of the window. The aft fitting is attached to the third frame forward of the aft bulkhead, directly opposite the cargo loading door.

"(b) *Skidproof Floor.*—Skidproof floor panels, shipped with the airplane as loose items, are provided for use by the paratroops to assure a safe footing when using the aisle. The complete floor consists of seven panels, attaching screws, and anchor nuts. Three of the smaller panels are installed in the aisle directly in front of each row of benches and the larger panel is installed opposite the jump door. These panels may be installed by removing the present pan-

els and substituting the skidproof floor panels.

"Note

"This flooring must be removed before loading cargo, as it is not designed to handle any loads greater than will be applied by the paratroops."

11. Plaintiffs' exhibit 18 is a blueprint of defendant's drawing of the steel anchor cable installed in various types of its airplanes. It depicts the cable extending longitudinally near the ceiling of the cabin from a point near the front bulkhead past the side door to a point near the rear bulkhead. The cable is ¼-inch in diameter and is secured at each end by a fastening mechanism attached to the ceiling. It is specified that the cable be of sufficient length to permit a six-inch sag to be adjusted to suit each airplane.

12. Plaintiffs' exhibit 19 is a blueprint of a drawing of the Aircraft Division of Fairchild Engine & Airplane Corp., Hagerstown, Maryland, depicting a swage-type design for securing the ends of an anchor cable in an airplane.

13. Defendant's exhibit 24 is certain paratrooper's equipment of the United States Army, consisting primarily of a main parachute pack with a static line or cord, the outer end of which has a snap hook adapted to engage and slide along an anchor cable of the type depicted in plaintiffs' exhibit 18, above described. A reserve parachute pack of the chest type is also part of the equipment.

A harness is provided to fit about the body of the paratrooper, and the tray of the main parachute pack is secured on the harness against the back of the wearer. The parachute proper is assembled on the tray, and a cover over the parachute is laced to the edge of the tray. The static line is secured at one end to the outside of the cover. By means of the snap hook at the other end, each individual in the line of paratroopers attaches his static cord to the overhead anchor cable in preparation for the jump from the airplane. The paratroopers walk in succession to the side door, and manually move their snap hooks along the cable. As each man jumps through the doorway, the static line is extended, and the cover is jerked off the parachute tray. The cover is attached to the apex of the parachute canopy by means of a break cord. The canopy and in succession its attached shroud lines and suspension ropes (which are secured to the harness) are drawn from the tray. When the canopy and the suspension assembly become fully extended, the break cord connecting the cover to the canopy is ruptured. Upon the opening of the canopy, the paratrooper is lowered slowly to the ground, and the cover and static line are left attached to the anchor cable of the airplane.

The reserve pack is used only in the event of the failure of the main pack to function. It is secured to the harness in front of the chest of the paratrooper, and is manually operated by the pulling of a rip cord, as distinguished from the automatic operation of the main pack. The reserve pack is not claimed to be an infringing structure.

14. Regarding claim 1 of Trusty Patent 1,859,542, none of the alleged infringing structures has "seats for passengers" or "parachutes connected to said seats" in a life-preserving mechanism for airships. None has "means, operated by the pilot of the airship, for swinging said seats, with the passengers therein, out of the airship, and dropping the seats and passengers in said parachutes."

The accused structures, represented by plaintiffs' exhibits 16, 17, 18, and 19 and defendant's exhibit 24, do not infringe claim 1 of Trusty Patent 1,859,-542.

15. Claim 1 of Trusty Patent 2,390,-230 contains the following specific elements in connection with an airplane, its cabin, and a side door: " * * * a plurality of parachute carriers movably mounted in said cabin one behind the other longitudinally of said cabin, parachutes connected to said carriers, respec-

tively, means whereby said carriers may be conveyed longitudinally rearwardly and then laterally in the cabin out through said cabin door and dropped from the plane, and means whereby said parachutes are automatically opened when said carriers are dropped from the plane."

The accused structures do not answer to these elements. The plaintiffs contend that men could be considered the carriers instead of the seats, that the harness of the accused parachute equipment (defendant's exhibit 24) is the same as a seat or carrier, and that the floor of the airplane could be considered as the conveying means.

The terms of the specification do not support such a construction of the language of the claim. On page 3 of the letters patent, at the bottom of column 1, line 72 et seq., it is stated:

"On the carrier mounting 1 are mounted a plurality of parachute carriers 96 to travel from one end of said mounting to the other and to be dropped off the rear end of said mounting out of the plane 34, which carriers may be of any suitable design or form, and are shown in the form of chairs in which persons such as passengers or soldiers may sit, and which may be converted into carriers for freight, mail or other cargo, and to said carriers are respectively connected parachutes 97 * * *."

On page 4, column 1, line 62 et seq., the following description is given:

"Each carrier 96 is secured in a parachute suspension harness 121 which comprises a pair of suspension straps 122, * * *."

On page 5, column 1, line 72 et seq., is the following:

"The carriers 96 are then occupied by passengers, or mail or freight is suitably packed therein, and the plane may then take off from the ground."

There are various other references, both in the specification and claims, to the carriers, the mounting, the harness, and related elements, clearly indicating their separate entities and functions.

As testified to by the defendant's expert, Carl Harper, the defendant's accused equipment did not comprise mounted carriers having parachutes connected with them and means for conveying them longitudinally and then laterally out through the door and dropped.

The accused structures, represented by plaintiffs' exhibits 16, 17, 18 and 19, and defendant's exhibit 24, do not infringe claim 1 of Trusty Patent 2,390,230.

16. As to claim 2 of Trusty Patent 2,390,230, the following elements thereof have no counterparts nor equivalents in the defendant's accused equipment: First, the carrier; second, a parachute container member secured on the carrier, nor the associated parachute parts and accessories mounted on the carrier; third, a harness in which a carrier is mounted; and fourth, a carrier-conveying means.

The defendant's exhibit 24 does include a main parachute pack with its harness, tray and cover, parachute, static cord, and a snap hook to be slid along an anchor cable of the type depicted in the plaintiffs' exhibit 18. The static line, snap hook, anchor cable and parachute assembly of the defendant's equipment are the mechanical equivalents of and perform the same functions as the static line, slidable ring, guide rod and parachute assembly of the patented device. However, all elements of claim 2 are not met, and the combination of this claim is not found in the defendant's equipment.

The accused structures, represented by plaintiffs' exhibits 16, 17, 18 and 19, and defendant's exhibit 24, do not infringe claim 2 of Trusty Patent 2,390,230.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are not entitled to recover, and the petition is therefore dismissed.